IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ANGELA F. PEEPLES,

      Plaintiff,

v.

KAISER PERMANENTE THE
SOUTHEAST PERMANENTE
MEDICAL GROUP, *also known as*
TSPMG,

      Defendant.

CIVIL ACTION FILE NO.

1:15-cv-3029-WSD-JKL

## FINAL REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Kaiser Permanente The Southeast Permanente Group's ("TSPMG") motion to dismiss Plaintiff Angela Peeples's employment discrimination complaint. [Doc. 29.] Peeples, who is proceeding *pro se*, initiated this action in August 2015 when she filed a complaint against her former employer, which she identified only as Kaiser Permanente. [Docs. 1, 5.] Peeples later filed a pleading correcting the employer's name as TSPMG, and the District Court ordered that Peeples's corrected pleading be docketed as her amended complaint. [Docs 24, 25.] TSPMG then filed the

instant motion to dismiss the amended complaint for failure to state a claim.  [Doc. 29.]  For the reasons that follow, I **RECOMMEND** that the motion to dismiss be **GRANTED**.

## I.   Amended Complaint

Peeples's amended complaint is difficult to follow, but most of her allegations concern the workplace environment at TSPMG and TSPMG's decision to eliminate her position without finding a new position for her at a different clinic or division.  [*See* Doc. 25 at 2-6.[1]]  She alleges that she was subject to race discrimination, retaliation for reporting "unethical activity" and harassing and "negative" comments in the workplace, and disability discrimination.  [*Id.* at 4-6.]  She also appears to allege that she was subject to a hostile work environment and that TSPMG violated the Consolidated Omnibus Budget Reconciliation Act ("COBRA").  [*Id.*]

From November 2008 to early 2015, Peeples worked as a nurse practitioner in the oncology department at TSPMG's Cumberland Medical Center.  During her employment with TSPMG, she alleges, she was subject to "[p]utdowns,

---

[1] Peeples's filings generally do not include consistent page numbers.  Thus, in referring to her pleadings and exhibits, I cite the PDF page numbers of those documents.

[h]arassment, [s]abotage, and [c]liques." [Doc. 25 at 4.] In December 2014, Peeples learned that her department was closing in a few months, and her position had been eliminated. [Doc. 1-2 at 179.[2]] In a severance letter, Peeples was told that the Cumberland Medical Center's "Infusion Center" was closing, and thus, her job in the oncology department would be eliminated. [*Id.*] Peeples alleges that, at times in the past when TSPMG closed a department, it transferred that department's staff to another TSPMG clinic or department. [Doc. 25 at 5-6.] Peeples, however, was not offered a position in another department. [*Id.* at 6.] Peeples further alleges that nurses had been let go during previous layoffs, but that TSPMG had not laid off its nurse practitioners. [*Id.* at 5-6.]

In January 2015, after Peeples was told about the layoff, a coworker contacted Rhunette Pledger, a TSPMG recruiter, to try to arrange a transfer for Peeples to the TSPMG Cobb Clinic. [Doc. 25 at 6, 15-16.] Peeples spoke with

---

[2] To describe the circumstances of Peeples's layoff, I refer to the severance letter that TSPMG sent her in December 2014. [Doc. 1-2 at 96-137.] In her amended complaint, Peeples refers to this letter and recites some of the terms of the letter in support of her claims. She also submitted a copy of the severance letter as an exhibit to her previous complaint. Thus, it seems that the document is central to her complaint and its authenticity is not in question, such that the Court may consider this document at the motion to dismiss stage. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctr. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

3

Pledger by telephone but was not offered a position. [*Id.* at 6.] Later, Peeples emailed Pledger about the position but did not receive a response. [*Id.* at 5.]

As to her claims of race discrimination, Peeples alleges that "all African American staff [were] laid off." [Doc. 25 at 4.] TSPMG, however, did not lay off two white employees, Martha Trout, a nurse, and Kelly Ashmyer, a pharmacist. [*Id.* at 5.] After being laid off, she was not offered a job coach or reassigned to another department, even though she applied for positions in TSPMG's Cobb Clinic and its neurology department. [*Id.* at 5-6.]

Peeples also alleges that TSPMG retaliated against her by terminating her employment after she reported "unethical concerns . . . concerning [Peeples], staff, and patients." [Doc. 25 at 4.] Peeples reported to someone at TSPMG that she was "feeling continued harassment" and that her coworkers were sabotaging her and speaking badly about her. [*Id.* at 2.] TSPMG continued to retaliate against her after the layoff by terminating her health insurance three months early, not offering her coupons for certain COBRA benefits, not offering her a position in another department, not responding to her requests seeking another position, not hiring her after she applied to work at the Cobb Clinic and in the neurology

4

department, not offering her a job coach to help her transition to a new job, and not giving her a letter of recommendation.  [*Id.* at 6.]

As to her hostile work environment claim, Peeples identifies three occasions on which she believed she was subject to racist remarks from coworkers.[3]  [Doc. 25 at 5.]  First, in February 2013, during tuberculosis training, a pharmacist remarked that a group of staff members "look[ed] like a bunch of KKK" and laughed.  [Doc. 1-2 at 117.]  Peeples also overheard the pharmacist repeating the remark later.  [*Id.*]

Second, in a staff meeting, Peeples's supervisor Dr. Hamrick referred to a newly-hired program coordinator named Martha as the "new face of oncology." [Doc. 1-2 at 105.]  Because Martha is white, Peeples alleges that Dr. Hamrick's comment had a "racial undertone."  [*Id.*]  She explains, "I feel that [physicians]

---

[3] In discussing these assertions, I refer to an exhibit that Peeples included with her initial complaint.  That exhibit shows that Peeples documented her interactions with her coworkers over a period of several years and reported those interactions to TSPMG's human resources department.  Peeples refers to that document in her amended complaint and states, "copies given to [the] Court with initial information due to large amount I will not resubmit . . . please let me know if needed."  [Doc. 25 at 2.]  Thus, it appears that she intends to incorporate that document into her amended complaint.  While I refer to the exhibit to clarify Peeples's factual allegations, I cannot rely on the exhibit to rewrite Peeples's amended complaint so that it states a claim.  *See GJR Invs., Inc. v. Cty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

are a clique of friends that have decided to come together to plan my demise without any plans to help me only to kill and destroy me so that I will be replaced with what Dr. Hamrick calls a new face of oncology (Caucasian like Martha)." [*Id.* at 103.]

Third, in November or December 2013, during a lunch break, Peeples asked a nurse several times why she was eating collard greens.  [Doc. 1-2 at 127-28.]  The nurse began to give a response involving a reference to "slaves in Brazil," but did not finish her response.  Several weeks later, Peeples emailed the nurse to ask her to explain the comment.  The nurse called Peeples to explain that she did not want to respond because she felt that Peeples was "blowing things up."  [*Id.*]

Regarding Peeples's claims of disability discrimination, she alleges that she has attention deficit hyperactivity disorder ("ADHD"), and on April 9, 2014, she disclosed that diagnosis to TSPMG employee relations consultant Elaunda Morrison.  [Doc. 25 at 5-9.]  Peeples appears to allege that she was having problems with her charting responsibilities, and those problems were related to her ADHD.  [*Id.* at 5-6.]  She asserts that TSPMG failed to offer support for her ADHD, even after she was told that she could take a class to help correct her

6

charting problems.  [*Id.* at 2, 5-6.]  Specifically, Morrison mentioned that Peeples could take a class to help with her charting, and "decisions were made" that Peeples should take the class.  [*Id.* at 2.]  No one offered her the opportunity to take the class, however.  [*Id.*]

Peeples also alleges that Dr. Hamrick believed that she was depressed. [Doc. 25 at 2.]  In August 2013, Dr. Hamrick suggested that she see a TSPMG behavioral health doctor for an evaluation, even though Peeples told Dr. Hamrick that she preferred to see her own doctor.  [*Id.*]  She also alleges that Dr. Hamrick subjected her to "putdowns" about her "mental status."  [*Id.*]

As to Peeples's COBRA claims, when TSPMG told Peeples that she would be laid off, it also sent her a letter informing her of her severance pay and benefits.  [Doc. 1-2 at 179.]  TSPMG told Peeples that she would receive regular wages for the next 90 days, until February 28, 2015.  She then would receive an additional 16 weeks of severance pay with deductions for health and dental insurance, and her health and dental benefits would remain in effect through that 16-week period, that is, until June 30, 2015.  Thereafter, she was entitled to continue her health care benefits at her own expense under COBRA.  TSPMG

also indicated that it would provide her with three months of career transition services from an outside firm. [*Id.*]

In March 2015, however, Peeples learned that at least some of her health benefits had ended early, and she had to pay out-of-pocket for a dental procedure. [Doc. 25 at 2, 20.] Her benefits provider later notified her that her TSPMG employee health coverage was valid through the end of June 2015. [*Id.* at 23.] She also lost points that she earned as part of a work health promotion, although she does not explain what those points would have allowed her to do. [*Id.* at 4.]

Peeples had COBRA coverage from July 2015 to September 2015. [Doc. 25 at 22-23.] Before her COBRA enrollment, however, she had difficulty requesting the COBRA enrollment forms from her human resources representative. [*Id.* at 6.] Even though the representative mailed the forms to Peeples twice, she did not receive them in the mail. [*Id.* at 2-3.]

While paying for COBRA, in September 2015, she had to pay out-of-pocket for dental expenses. [Doc. 25 at 25.] Peeples also had difficulties with her plan administrator while on COBRA. She had to produce an ADHD diagnosis because the administrator planned to deny her reimbursements under a Flex Spending and Supplemental Behavioral Health program. [*Id.* at 3.] She also

had to prove "constantly" that she had paid for her benefits under COBRA. Peeples alleges that she decided to stop paying for COBRA in October 2015. [*Id.*]

## II.   Motion to dismiss standard

In evaluating a Rule 12(b)(6) motion to dismiss, a court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not provide "detailed factual allegations," but it must provide factual allegations sufficient to set forth the plaintiff's entitlement to relief. *Twombly*, 550 U.S. at 555.   Providing only "labels and conclusions" is insufficient, "and a formulaic recitation of the elements of a cause of action will not do." *Id.*

Federal courts construe *pro se* pleadings liberally. *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007).  But while courts show leniency to *pro se* litigants, they cannot "serve as *de facto* counsel [or] rewrite an otherwise deficient pleading in order to sustain an action." *GJR Invs.*, 132 F.3d at 1369.

### III.   Peeples's complaint is not subject to dismissal under Rule 12(b)(6) as a shotgun complaint.

TSPMG seeks the dismissal of Peeples's amended complaint for failure to comply with Federal Rule of Civil Procedure 8 by not providing a short and plain statement of her claims.  [Doc. 29-1 at 7-10.]  TSPMG argues that Peeples's complaint is a shotgun pleading because it does not give TSPMG fair notice of her claims and the factual bases for those claims, it does not contain concise allegations, and it does not plead separate counts for each claim.  [*Id.* at 9.]

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Further, under Federal Rule of Civil Procedure 10(b), "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances."  Fed. R. Civ. P. 10(b).  Each claim generally should be asserted in a separate count.  *Id.*

Pleadings that run afoul of Rules 8(a)(2) and 10(b) "are often disparagingly referred to as 'shotgun pleadings.'"  *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320-21 (11th Cir. 2015).  The Eleventh Circuit has criticized shotgun pleadings repeatedly.  *Id.* at 1321 & n.9.  Examples of shotgun pleadings

10

include complaints that are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action" and complaints that do not separate each claim into a different count. *Id.* at 1322-23. The common feature of all shotgun pleadings is that they fail to give the defendants adequate notice of the claims against them and the grounds on which each claim rests. *Id.* at 1323. When a plaintiff files a shotgun complaint to which the defendant cannot respond, the appropriate remedy is for the defendant to move for a more definite statement under Fed. R. Civ. P. 12(e), or for the Court to *sua sponte* require the plaintiff to replead her complaint. *See id.* at 1321 n.10.

TSPMG is correct that Peeples's amended complaint is a shotgun pleading. The complaint does not use separate counts to separate the causes of action, and it contains conclusory statements that Peeples is entitled to relief. If, however, TSPMG was unable to respond to her amended complaint as a shotgun pleading, it could have moved for a more definite statement under Rule 12(e). *See Weiland*, 792 F.3d at 1321 n.10. Instead, TSPMG has adequately responded to Peeples's complaint and is on notice of Peeples's claims and the factual bases for those claims. Thus, the Court will consider the merits of Peeples's complaint rather than order her to replead.

11

## IV.   Peeples's disability discrimination claim is unexhausted.

Peeples alleges that she was subject to disability discrimination based on her ADHD because TSPMG told her that she could take a class to help train her on her charting responsibilities but then never offered her the class.  [Doc. 25 at 5.]  She also asserts that Dr. Hamrick asked her to see a TSPMG behavior health doctor, rather than Peeples's usual medical provider, because he believed that she was depressed.  [*Id.* at 2.]

TSPMG argues that Peeples's disability discrimination claim is unexhausted because she failed to include any allegations about disability discrimination, or anything related to a disability, in the charge of discrimination that she filed with the Equal Employment Opportunity Commission ("EEOC"). [Doc. 29-1 at 10-11.]  In the alternative, TSPMG argues that Peeples's complaint fails to state a disability discrimination claim as a matter of law.  [*Id.* at 11-15.]

Prior to filing claim for disability discrimination under the Americans with Disabilities Act ("ADA"), a plaintiff must first file a charge of discrimination with the EEOC.  *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 892 (11th Cir. 2014); *see also Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (discussing the exhaustion requirement in the context

12

of a complaint brought under Title VII of the Civil Rights Act of 1964 ("Title VII")).  "The purpose of the exhaustion requirement is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts."  *Gregory*, 355 F.3d at 1279 (alteration in original) (quotation omitted).  A plaintiff may raise claims in federal court that "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint.  *Id.* (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1980)); *Scott v. Shoe Show, Inc.*, 38 F. Supp. 3d 1343, 1356 (N.D. Ga. 2014).  A plaintiff may not, however, allege new acts of discrimination that were not in the EEOC charge.  *Gregory*, 355 F.3d at 1279-80; *Scott*, 38 F. Supp. 3d at 1356.  Where a plaintiff makes no reference to disability discrimination in her EEOC charge and does not allege a disability in her charge, the EEOC generally is not on notice that the plaintiff has a disability claim, and the disability claim is unexhausted.  *See, e.g.*, *Sessom v. Wellstar Hosp.*, No. 1:08-cv-2057-TWT, 2009 WL 1562876, at *2-3 (N.D. Ga. May 29, 2009).

In *Scott*, the plaintiff's EEOC charge alleged solely a complaint arising under the ADA.  38 F. Supp. 3d at 1357.  The court concluded that the EEOC

charge did not suggest any claims of discrimination under Title VII and, thus, the plaintiff's judicial Title VII claims were barred for failure to exhaust administrative remedies. *Id.* Likewise, in *Dowlatpanah v. Wellstar Health System, Inc.*, the Court considered an EEOC charge in which the plaintiff marked only the box for discrimination on the basis of national origin and alleged that he believed he was fired because of his national origin in violation of Title VII. No. 1:05-cv-2752-WSD-RGV, 2007 WL 639875, at *5 (N.D. Ga. Feb. 26, 2007). The plaintiff's judicial complaint, however, raised a claim about retaliation. *Id.* at *1. The Court determined that that claim was unexhausted because the plaintiff did "not even suggest" that he suffered retaliation in the EEOC charge. *Id.* at *6.

In her EEOC charge,[4] Peeples checked the boxes for discrimination based on "race" and "retaliation." [Doc. 29-2.] The narrative portion of the EEOC charge states:

---

[4] The Court may consider Peeples's EEOC charge, even though she did not attach it to her amended complaint, because the document is central to Peeples's claim and its authenticity is not in question. *Speaker*, 623 F.3d at 1379. Courts routinely consider the EEOC charge in discrimination cases when ruling on motions to dismiss, even when the EEOC charge is not attached to a pleading. *Edmonds v. Southwire Co.*, 58 F. Supp. 3d 1347, 1352 n.6 (N.D. Ga. 2014). I also note that Peeples attached her EEOC charge and other EEOC documents to a previous version of her complaint.

I.   I began working for [TSPMG] on or about November 3, 2008, as a Nurse Practitioner. In 2013, I was subjected to racially harassing comments. I have also been subjected to racially harassing attitudes. In August 2014, I complained to Angela Pilcher, Human Resources Representative, regarding the comments and attitudes. In December 2014, I was told I would be laid-off.

II.   Ms. Pilcher stated that I was laid-off due to the closing of the department.

III. I believe I have been discriminated against because of my race (African-American) and retaliated against for participating in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

[*Id.*]

Nothing in Peeples's EEOC charge indicates that she believed that she had been subjected to discrimination on the basis of a disability or even suggests that she had a disability. Peeples's EEOC charge only put the EEOC on notice that Peeples believed she had been subject to a hostile work environment based on "racially harassing comments" and "racially harassing attitudes" and that she believed her termination was the product of race discrimination and retaliation for reporting the racist comments and attitudes to her employer. [Doc. 29-2.]

15

Moreover, it is not relevant whether, during the course of an investigation into Peeples's claims, the EEOC might have discovered that Peeples had ADHD or that Dr. Hamrick thought that she had depression.  As the Court explained in *Dowlatpanah*, the relevant question is not whether the EEOC would have had access to records indicating that the plaintiff complained about other kinds of discrimination, but instead is "whether the allegations in the EEOC charge would put the EEOC on notice to investigate" the plaintiff's judicial claims.  2007 WL 639875, at *5 n.3.

Finally, to the extent that Peeples's complaint raises hostile work environment and retaliation claims arising under the ADA, those claims are also unexhausted.  Nothing in the EEOC charge suggests that Peeples believed that she was subject to a hostile work environment based on comments about her disability or perceived disability, or that she believed she was terminated or harassed after reporting such conduct.

In sum, Peeples's disability discrimination claim is unexhausted.  To the extent that she attempts to raise a hostile work environment claim or a claim of retaliation based upon complaints about disability discrimination, those claims are also unexhausted.  Thus, it is **RECOMMENDED** that those claims be

16

**DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies.[5]

**V.     Peeples has failed to state a race discrimination claim based on disparate treatment.**

TSPMG argues that Peeples's allegations are insufficient to state a claim for race discrimination.  [Doc. 29-1 at 15-19.]  TSPMG argues that Peeples's amended complaint contains too few facts to allow the Court to infer that any decision-makers or employees involved in the decision-making process made any race-related comments.  [*Id.* at 16-17.]  Moreover, TSPMG asserts, the amended complaint does not suggest that Peeples was treated differently than any similarly situated employee outside of her protected class.  [*Id.* at 17-19.]

Title VII provides that it is unlawful for an employer to discriminate against an employee on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  To state a Title VII discrimination claim, a complaint need only provide enough factual matter to "plausibly suggest" that the plaintiff suffered an adverse employment action due to intentional discrimination.  *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015).

---

[5] I do not address TSPMG's alternative argument about the merits of Peeples's disability claim because the claim is clearly unexhausted.

17

Peeples's allegations do not plausibly suggest that her termination was due to intentional race discrimination.  First, she appears to assert that the fact that Trout and Ashmyer, white employees, kept their jobs after the oncology department closed shows that her own termination was due to intentional discrimination.  [Doc. 25 at 5.]  Nothing in the complaint, however, suggests that Trout and Ashmyer are proper comparators.  Peeples alleges that they were "Cumberland office staff" but does not allege that they were worked in the oncology department or the Infusion Center.  [*Id.*]  She also does not allege that their job duties were similar to her own.  In fact, given that Trout is a nurse and Ashmyer is a pharmacist, [*id.*], it is highly unlikely that their jobs were similar to Peeples's.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (explaining, in the summary judgment context, that a comparator must be "nearly identical" to the plaintiff to prevent courts from second-guessing employment decisions).  Moreover, nothing in Peeples's complaint suggests that any Cumberland oncology or Infusion Center nurse practitioner outside her protected class was allowed to stay at TSPMG after the layoffs.

Peeples's blanket statement that TSPMG laid off all African-American staff does not, without more, plausibly suggest that Peeples was terminated

18

because of her race.  [*See* Doc. 25 at 4.]  In most cases, an allegation that an employer targeted members of a protected class for layoffs would be a sufficient—and troubling—basis for a race discrimination claim.  But here, Peeples has provided no factual context that might tend to show that TSPMG's African-American employees were targeted for layoffs because of their race.  For example, she does not provide any allegations about the scope of the layoffs, namely, whether any other African-American employees were laid off when TSPMG closed the oncology department and Infusion Center, and whether any employees in the oncology department and Infusion Center outside of her protected class were allowed to keep their jobs.  She refers to previous TSPMG department closings in which nurse practitioners were not laid off, but she still fails to identify a nurse practitioner outside of her protected class who was allowed to keep working at TSPMG.  [*See id.* at 5-6.]

Nor do Peeples's previous filings give context to this statement in a way that might support a discrimination claim.  In a previous filing, Peeples alleged that she was the only African-American employee in her department.  [Doc. 3 at 2.]  In light of that allegation, Peeples may mean that, by firing her, TSPMG laid off "all" the African-American staff.  In that same filing, she alleged that eight

19

African-American employees—including Peeples, nurses, and medical assistants—were "informed . . . of the layoff," but four white staff—Dr. Hamrick, Dr. Gladney, Trout, and Ashmyer—continued to work at TSPMG. [*Id.* at 3.] It is unclear whether Peeples means that those other African-American staff members were actually laid off or were simply "informed" of the layoff, and Peeples does not explain whether any of these employees were in her department, were part of the Infusion Center, or were subject to layoffs because of department closings.

In short, in the context of her complaint, Peeples's statement that all African-American staff were laid off is too vague to state a race discrimination claim based on disparate treatment. Affording Peeples's complaint liberal construction, the Court cannot discern a plausible claim of race discrimination.

Finally, Peeples's allegation that she heard three offensive comments during her time at TSPMG does not create a plausible suggestion of intentional discrimination on the part of TSPMG's decision-makers. Peeples's filings do not suggest that any decision-maker made a racist comment, was racist, or condoned racism in the workplace.

The factual allegations in the complaint are insufficient to allow the Court to infer that she was targeted during layoffs because of her race or that any nurse

20

practitioner outside of Peeples's protected class was given a new position at TSPMG after the oncology layoffs.  It is therefore **RECOMMENDED** that this claim be **DISMISSED WITH PREJUDICE** for failure to state a claim.

**VI.   Peeples has failed to state a hostile work environment claim.**

Peeples appears to allege that she was subject to a racially hostile work environment based on three remarks that she heard at work.  Namely, she refers to the "slaves in Brazil" remark, the remark about the KKK, and Dr. Hamrick's remark that an employee named Martha was the "new face of oncology."  [Doc. 25 at 5.]  Peeples also lists a number of grievances from her time at work that have no bearing on race.  [*See id.*]

TSPMG argues that Peeples's hostile work environment claim should be dismissed because she has provided no additional facts tending to show that she was subject to harassing comments based on her race.  [Doc. 25 at 19-21.]

The Supreme Court has explained that discriminatory conduct that is "so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule on workplace equality."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). A hostile work environment claim under Title VII is predicated on proof that "the

workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 21; *accord Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The Eleventh Circuit has held that, to set out a prima facie case of a hostile work environment, a plaintiff must show that (1) he belongs to a protected group, (2) he has been subject to unwelcome harassment, (3) the harassment is based on a protected characteristic of the employee, (4) the harassment is sufficiently "severe or pervasive" to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) the employer is responsible for the hostile work environment under a theory of vicarious or direct liability. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). As a matter of pleading, however, a plaintiff need not allege each and every element of the prima facie case. *See EEOC v. Jomar Transp., Inc.*, No. 1:13-cv-3143-ODE, 2014 WL 12069843, at *3 (N.D. Ga. Aug. 12, 2014). Rather, the complaint must contain sufficient factual matter to plausibly state a claim for relief. *Id.*

Title VII is not a civility code, and only extreme conduct will alter the terms and conditions of employment. *Uddin v. Universal Avionics Sys. Corp.*, No. 1:05-cv-1115-TWT, 2006 WL 1835291, at *3 (N.D. Ga. June 30, 2006) (citing *Faragher v. City of Boca Raton*, 524 U.S. 774, 788 (1998)). For offensive comments like racial slurs or epithets to alter the terms and conditions of employment, they must be "so commonplace, overt and denigrating they created an atmosphere charged with racial hostility." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995). A court also may consider whether the employee is subject to conduct that is threatening or humiliating and whether the conduct interferes with the plaintiff's performance at work. *Id.* at 1521-22.

Here, Peeples has failed to allege that she was subject to a hostile work environment because her allegations do not plausibly suggest that she was subject to "severe or pervasive" harassment. Over the course of a year, Peeples overhead one offensive remark, and a coworker told her something that she believed was the start of an offensive remark. Dr. Hamrick also made a remark that Martha was the new face of oncology, which Peeples found offensive because Martha is white. There is no plausible inference that those isolated instances were "so commonplace, overt[,] and denigrating that they created an atmosphere charged

23

with racial hostility." *See Edwards*, 49 F.3d at 1521; *see also Little v. United Techs. Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997) (holding that a racially charged remark by a coworker does not, without more, constitute an unlawful employment practice under the opposition clause of 42 U.S.C. § 2000e-3(a)).

Moreover, the remarks about slavery in Brazil and the KKK appear to have been made in jest, rather than for the purpose of humiliating or threatening Peeples. *See Jones*, 683 F.3d at 1299 (distinguishing between remarks that are physically threatening or humiliating and mere offensive utterances). Even though those remarks were inappropriate and Peeples found them offensive, they are not the sort of comments that create an environment "charged with racial hostility." *See Edwards*, 49 F.3d at 1521; *see also Jones*, 683 F.3d at 1297 (explaining that the "social context" of behavior is relevant in a hostile work environment analysis). It is also difficult to understand how Dr. Hamrick's remark about a newly hired employee had any basis in race. *See Jones*, 683 F.3d at 1297 (noting that comments that do not relate to the race "of the actor or of the offended party" are not part of a hostile work environment analysis). Peeples's interpretation of that comment seems to be based on her suspicion that the

24

oncology doctors were conspiring against her as a "clique of friends," and her pleadings contain no objective basis for her belief that Dr. Hamrick was making a racist remark.

Because there is no plausible suggestion in the complaint that Peeples was subject to a hostile work environment, it is **RECOMMENDED** that her hostile work environment claim be **DISMISSED WITH PREJUDICE** for failure to state a claim.

## VII.   Peeples has not stated a claim for retaliation under Title VII.

TSPMG argues that Peeples has not stated a retaliation claim because she fails to allege that she engaged in any Title VII protected activity.  [Doc. 29-1 at 21-23.]  Specifically, Peeples alleges only that she suffered retaliation because she reported "unethical concerns" in her department, but in her complaint she does not link those "unethical concerns" to race discrimination or any unlawful employment practice prohibited under Title VII.  [*Id.*]

An employer is prohibited from retaliating against an employee because he has opposed any unlawful employment practice prohibited under Title VII or because he made a charge, testified, assisted, or participated in a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3(a).  Thus, to state a retaliation

claim under Title VII, a plaintiff must allege that she engaged in statutorily protected activity, she suffered a materially adverse action, and there was some causal connection between the two events. *Palmer v. McDonald*, 624 F. App'x 699, 702 (11th Cir. 2015) (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)).

The Court agrees with TSPMG that Peeples's complaint does not contain any allegation that she opposed an unlawful employment practice under Title VII or made a charge, testified, assisted, or participated in a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3(a). Peeples's allegation that she reported ethics problems and her general assertion that she reported harassment and "negative comments" in her department is not sufficient to allow the Court to infer that she opposed an unlawful employment practice, namely, race discrimination.[6] [*See* Doc. 25 at 2, 4.] Thus, even if she suffered a materially adverse action for reporting some kind of ethics-related misconduct, the facts in the complaint are insufficient to state a retaliation claim. *See Palmer*, 624 F. App'x at 702.

---

[6] I assume Peeples is trying to bring a retaliation claim based on reporting race discrimination because that retaliation claim is the only claim that she exhausted in her EEOC charge.

26

The Court has reviewed the numerous documents that Peeples has included with her filings since she initiated this case, including the document that she submitted to her human resources department in which she complained about a handful of arguably-race-related comments that she heard over a period of several years.  Even affording her liberal construction, however, Peeples is responsible for the allegations that she includes in her complaint.  Peeples's assertion is that she suffered retaliation for reporting "unethical concerns" and general harassment and negative comments, and the Court cannot rewrite her pleadings for her so that they state a claim.  *See GJR Invs.*, 132 F.3d at 1369.  Nor can the Court use the reams of documents that Peeples has filed with her pleadings to identify potential causes of action for her.  *See id.*

Even if the Court could construe Peeples's complaint to assert a claim based on the fact that she reported a handful of race-related remarks to TSPMG's human resources department, the Court has serious doubts that that act constituted opposition to an unlawful employment practice.  *See Little*, 103 F.3d at 961 ("[A] racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice under the opposition clause of Title VII, 42 U.S.C. § 2000e-3(a), and opposition to such a remark, consequently, is not statutorily

27

protected conduct."). An employee's opposition must be directed at an unlawful employment practice of an employer, not that of a private individual. *See id.* at 959. Under the circumstances of the case, the Court also has serious doubts that Peeples could have an objectively reasonable belief that reporting a handful of comments over the course of several years could constitute opposition to an unlawful practice of her employer. *See id.*; *see also Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) ("Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer . . . an employee's contrary belief that the practice is unlawful is unreasonable.").

In sum, Peeples has failed to state a retaliation claim under Title VII because her allegations that she suffered retaliation for reporting "unethical conduct" do not show that she engaged in any statutorily protected activity under § 2000e-3. It is therefore **RECOMMENDED** that her retaliation claim be **DISMISSED WITH PREJUDICE** for failure to state a claim.

## VIII.  Peeples has not stated a claim arising under COBRA.

Peeples's assertions about her health insurance and COBRA appear to be that, as a means of discriminating and retaliating against her, TSPMG made it

28

difficult for her to use her health insurance.  [*See* Doc. 25 at 2-6.]  Thus, it appears that she treats those assertions as an adverse employment action relating to her discrimination claims, not as an independent claim.  For the reasons set forth above, Peeples has not stated a claim for relief on any of her employment discrimination claims.

To the extent, if any, that Peeples is attempting to raise a claim that TSPMG violated COBRA by not giving her notice of her COBRA eligibility, that claim is refuted by the pleadings.  Under COBRA, a health plan administrator must provide written notice to an employee of her right to continue coverage under COBRA.  29 U.S.C. § 1166(a)(4); *Scott v. Suncoast Bevereage Sales, Ltd.*, 295 F.3d 1223, 1230 (11th Cir. 2002).  Assuming, *arguendo*, that TSPMG was Peeples's health plan administrator, it notified her of her rights under COBRA in the severance letter.  [Doc. 1-2 at 179.]  Moreover, Peeples had health coverage under COBRA from July 2015, when she first became eligible after her regular health insurance benefits ended, to September 2015.  [Doc. 25 at 22-23.]  She elected to stop paying her COBRA plan premiums starting in October 2015.  [*Id.* at 3.]  Peeples does not explain how her problems with the insurance

company while under her employee health coverage and COBRA coverage mean that TSPMG violated COBRA.

To the extent that Peeples attempts to raise a COBRA notice claim, the complaint does not show that TSPMG failed to give Peeples notice of her eligibility for continued coverage under COBRA.   Accordingly, it is **RECOMMENDED** that the COBRA claim be **DISMISSED WITH PREJUDICE** for failure to state a claim.

## IX.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that TSPMG's motion to dismiss [Doc. 29] be **GRANTED**.   Peeples's claims arising under the ADA should be **DISMISSED WITHOUT PREJUDICE** as unexhausted.   Her remaining claims should be **DISMISSED WITH PREJUDICE** for failure to state a claim.

IT IS SO RECOMMENDED this 14th day of December, 2016.

_____

JOHN K. LARKINS III
United States Magistrate Judge